KING COUNTY v. MARTIN. (No. 8044.)†

(Court of Civil Appeals of Texas. Ft. Worth. Nov. 21, 1915. Rehearing Denied Jan. 9, 1915.)

1. PUBLIC LANDS ☞173 — SCHOOL LANDS — VACATING SALES — ADMISSIBILITY — SURROUNDING CONDITIONS.

In a suit to set aside a sale of school land on the ground of fraud, evidence that the interest charged on the deferred purchase money was less than was the usual rate in such cases was not admissible, where it was not first shown that the surrounding conditions were the same.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. ☞173.]

2. APPEAL AND ERROR ☞232 — REVIEW — PRESENTATION IN COURT BELOW.

Where evidence was rejected on one objection, the ruling cannot on appeal be justified on another ground not raised.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1351, 1368, 1426, 1430, 1431; Dec. Dig. ☞232.]

3. PUBLIC LANDS ☞173 — SCHOOL LANDS — ADEQUACY OF PRICE—EVIDENCE.

In a suit to set aside a sale of school land, evidence that the interest charged on the deferred purchase money was less than usual is admissible to show adequacy of price.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. ☞173.]

4. PUBLIC LANDS ☞173 — SCHOOL LANDS — SALES—VACATION.

A sale of school land will not be set aside because of a mere inadequacy of price.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. ☞173.]

5. APPEAL AND ERROR ☞1170 — REVIEW — HARMLESS ERROR.

In a suit to set aside a sale of school land, the erroneous exclusion of evidence showing inadequacy of price should be disregarded, under court rule 62a (149 S. W. x), where there was like evidence of similar import.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4032, 4066, 4075, 4098, 4101, 4454, 4540–4545; Dec. Dig. ☞1170.]

6. PUBLIC LANDS ☞173 — SCHOOL LANDS — SETTING ASIDE SALE—ACTIONS—EVIDENCE.

In a suit to set aside a sale of school lands, evidence held to warrant a finding that a better price could not have been obtained, and that the price charged was not inadequate.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. ☞173.]

7. TRIAL ☞350—SPECIAL FINDINGS.

Special findings on evidentiary matters are not required.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 828–833; Dec. Dig. ☞350.]

8. TRIAL ☞351—SPECIAL FINDINGS.

In a suit to set aside a sale of school land for fraud and inadequacy of price, the court refused to submit special issues whether the commissioners' court sold the land without investigating its character, or without advertisement, and with notice that it could be sold upon better terms. Special issues whether the sale was made with fraudulent understanding, whether a better price could have been obtained, and whether the price charged was inadequate, were submitted. Held, that the special issues requested went merely to evidentiary matters, being substantially covered by the issues submitted, and hence the refusal was not error.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 829, 834–839; Dec. Dig. ☞351.]

9. PUBLIC LANDS ☞173—SCHOOL LANDS— SALES—VACATION.

Though the commissioners' court in selling school land fraudulently intended to favor the purchaser, that fact does not warrant a vacation of the sale, where the county received full value and was in no way injured.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. ☞173.]

10. PUBLIC LANDS ☞173—SCHOOL LANDS— SALES — COMMISSIONERS' COURT — POWERS —"COUNTY."

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 1365, declaring that "counties" are bodies politic and corporate, with power to sue and be sued, the commissioners' court of a county may ratify a sale of school land, which the court might originally have made, and such ratification cures defects in the original sale.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 544–551; Dec. Dig. ☞173.

For other definitions, see Words and Phrases, First and Second Series, County.]

11. VENDOR AND PURCHASER ☞43—FRAUDULENT SALES—VACATION OF.

That a sale was induced by the purchaser's fraud does not render it ipso facto void, and the vendor may thereafter affirm it.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 67, 68; Dec. Dig. ☞43.]

Appeal from District Court, Jones County; John B. Thomas, Judge.

Action by King County against George B. Martin. From a judgment for defendant, plaintiff appeals. Affirmed.

Walter S. Pope, of Jefferson City, Sporer & McClure, of Jacksboro, and Carrigan, Montgomery & Britain, of Wichita Falls, for appellant. J. M. Carter, of Aspermont, Browne & Hawkins, of Paducah, Chapman & Coombes, of Anson, Fires & Diggs, of Childress, and Stephens & Miller, of Ft. Worth, for appellee.

CONNER, C. J. Briefly stated, this suit was instituted by King county to set aside, on the ground of fraud, a sale and conveyance of four leagues of King county school lands for $1 per acre on 20 years' time, with interest at the rate of 3 per cent. per annum, made on the 16th day of February, 1899. The case was submitted to a jury upon special issues, and upon the receipt of the verdict the court rendered a judgment in appellee's favor upon the answers, and King county appeals.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

†For opinion on motion for rehearing, see 173 S. W. 1200.

The plaintiff's petition is quite lengthy, but in substance it was alleged that J. M. Martin, the then county judge, and appellee, George B. Martin, conspired together to secure the sale under an agreement between them that George B. Martin should purchase the land with the aid and assistance of J. M. Martin, and that the purchase should inure to the joint benefit of both of the parties. It was also alleged that the character and quality of the land had been misrepresented to the commissioners' court, which representations, through the influence of said J. M. Martin, induced the commissioners to join in the sale. It was further alleged that the sale had been made hurriedly, without advertisement, without giving others an opportunity to buy, and for a grossly inadequate price, by reason of all which it was charged that the act of the commissioners was fraudulent and the sale of no validity. The defendant Martin denied the allegations of fraud and misrepresentations.

The first special issue submitted to the jury, and which embodies the principal ground of fraud having support in the evidence, reads as follows:

"Special Issue No. 1. At the time that the commissioners' court of King county entered the order of February 16, 1899, making the sale of the land in controversy to Geo. B. Martin at a $1 per acre on 20 years' time, with interest at the rate of 3 per cent. per annum, was there an agreement and mutual understanding between the defendant, Geo. B. Martin, and J. M. Martin, county judge, that the defendant, Geo. B. Martin, should take or hold said lands for the benefit of himself and the said J. M. Martin, or that the said J. M. Martin should have some interest in said lands, or the profits or proceeds which might be realized on said lands by the said Geo. B. Martin?"

To this issue the jury answered, "No."

The remaining special issues with the answers thereto that we deem controlling are the third and sixth, reading as follows:

"Special Issue No. 3. State whether the commissioners' court of King county on February 16, 1899, by the use of ordinary care and diligence, could at that time have sold the King county school lands for a better price than $1 per acre on 20 years' time at 3 per cent. interest per annum?"

To this issue the jury answered, "No."

"Special Issue No. 6. What was the market value of the land in controversy, per acre, on or about the 16th day of February, 1899, when sold on 20 years' time at 3 per cent. interest per annum?"

To which issue the jury answered, "$1 per acre."

Without observing the order of the presentation of the assignments, we will first state that appellant offered as a witness J. M. Martin, who testified in accord with the ground of fraud recited in the court's first special issue, but appellee, George B. Martin, categorically denied any agreement of the kind, and denied that J. M. Martin was interested in any way in the sale or in any proceeds that might arise therefrom, and it

173 S.W.—61

is not contended on this appeal that the answer of the jury to said first special issue can be set aside for want of evidence to support it. The verdict, however, in answer to the third and sixth special issues, above presented, is so attacked, and it becomes necessary for us to notice, which we will do briefly, the testimony relating to these issues.

W. M. Lay testified:

That he had known the King county school lands since 1887, and knew the market value of the same in the year 1899; that "the market value of such lands at that time was from 75 cents to $1 per acre"; that the King county school land, as compared with other lands in that county, is about an average of all the land in the county as a whole; and that "the market value of lands of average quality in Lamb county, Tex., in the year 1899, was from 75 cents to $1 per acre."

On cross-examination, among other things, he said:

"I do not know whether King county could have sold these lands to other parties, if they had been properly advertised the time they were sold to George B. Martin or not, had other parties been given an opportunity to bid, at more than $1 per acre on 40 years' time, with interest at 3 per cent. per annum, but I do not think so. * * * Part of the land is good, and part of it is sand. * * * The price of $1 per acre, which I have stated these lands were worth, was upon the usual terms of sale, which was on from 20 to 40 years' time at 3 per cent. interest. There were no lands selling in that country at that time for cash. * * * I do not know what these lands were leasing for at the time Martin bought them, but three cents per acre per year was the usual price."

J. W. Puckett testified:

That he knew the King county school lands in Lamb county and had known them for about 15 years; that he owned lands in Bailey, Lamb, and Cochran counties, and was familiar in a general way with all these lands; that "I know the market value of King county school lands in Lamb county in 1899, and the market value of the same was from 75 cents to $1 per acre. Some parts of the land are sand hills, and other parts are firm lands; but, taking the entire country over, I would say that the King county school lands are about the average, and I know what the market value of lands of average quality in Lamb county in the year 1899 was, and the value of such lands was from 75 cents to $1 per acre."

The witness' testimony showed that he had been on the land a number of times, including the year 1889, saying that "I ranched adjoining Janes Bros.," who had the King county school lands leased. He further stated:

"I do not think it is a fact that these lands could have been sold for more than $1 per acre prior to 1899, as I have no knowledge of any lands in that country selling for more than $1 per acre prior to or during 1899. * * * The land was worth the price I mentioned on long time, with low interest, because no lands were selling for cash. In offering the lands for sale, the length of time in which the purchase money was to be paid, and the terms of sale, the rate of interest, would affect the price per acre for which the lands could be sold. At the time these lands were sold to George B. Martin in 1899, I think they were leasing for three cents per acre."

L. T. Lester testified:

"I have had quite a bit of experience in dealing with lands in the western part of the state of Texas since the year 1890 up to the present time. I know the King county school lands located in Lamb county well, and have known them since 1897. I would say the southwest part of the land is very hard, smooth, grass land, with some lakes, and the southeast part is very broken, and the northeast and northwest parts extend into the sand hills and is very sandy and some extensive sand hills. I worked cattle over the land during 1897 to 1899, and I know the market value of the lands in 1899. It was from $1 to 75 cents per acre. I bought the Crosby county school lands in 1898, paying $1 per acre for same on 20 years' time, at 5 per cent. interest, payable annually."

L. G. Wilson testified:

That he knew the King county school lands, and had known them about 15 years, and that "we ranched on the adjoining lands for a number of years. I know what the market value of said land, taken as a whole, was in 1899, and it was about $1 per acre. * * * I should think that land that was sold on 20 years' time, with no cash payment, but with the provision that the interest shall be payable annually and sold at 5 per cent. interest, would bring a lower price than if the same land was sold at 3 per cent. interest, and that it would affect the price some. I cannot say what would have been the difference in price of King county school lands in 1899, where the interest charged was 6 per cent., and where the interest charged was 3 per cent., interest payable annually, and the principal not to be paid for 20 years, but the land would be worth some more at 3 per cent. than at 6 per cent. I have never heard of any individual or any of the organized counties of Texas selling their lands on 20 years' time with as low a rate of interest as 3 per cent. * * *"

He further stated that the lands to which he referred were leased at from 2½ to 3 cents per acre at the time they were sold to George B. Martin in 1899.

T. W. Morrison testified:

That he had known the King county school lands about 25 years, had ranched in Lamb county for about 15 years, and further that "it is hard to say what the market value of lands in Lamb county were at that time. I know what lands were selling for in 1899. This land was not worth more than $1 per acre in 1899. * * * Interest on deferred payments on lands purchased from the state and counties has been from 3 to 5 per cent. If the rate of interest was 5 to 6 per cent. per annum, the land would be sold for a lower price than it would if the rate of interest were 3 per cent. I have never heard of any individual or any of the organized counties of Texas selling their lands on 20 years' time with as low a rate of interest as 3 per cent."

J. H. Slayton testified:

That he was acquainted with the King county school lands and had been for about 23 years; that he had been over it a number of times, as part of it was in a pasture over which he ran cattle; that "the reasonable market value of King county school lands in 1899 was $1 per acre * * * counties and to the state the interest has been from 3 to 5 per cent. If the rate of interest were high, the land would sell for less price. I do not think this land is worth as much as the average tract of land in that country."

R. C. Ware testified:

That he had known the King county school lands about 20 years, and had been over them a number of times, and further that "I know what the market value of the King county school lands was in 1899, and it was about $1 per acre. This land compares favorably with the average land of that country. * * * I do not think the (they) could have got more than $1 per acre for this land, because as good land could be bought at that price. * * * The rate of interest would make a difference in the price per acre, but I do not know what the difference would be, but in my judgment it would only make a very small difference. I do not recall any sale where any person or county in Texas sold their land on 20 years' time with only 3 per cent. interest."

Tom Wilson testified:

That he had known Lamb county, and the King county school lands therein, about 15 years, and had been over it hundreds of times; that he was in the cattle business in 1899, and had been for six or seven years; that "I know the market value of King county school lands in Lamb county in 1899. It was about $1 per acre. * * * These lands had a market value at that time of $1 per acre purchased on time of 40 years, with interest at the rate of from 3 to 5 per cent. on deferred payments. In offering these lands to the public for sale, the length of time and rate of interest the purchase money bore would affect the price per acre the land brought. * * * From counties and from the state it has been the custom to get these deferred payments for from 3 to 5 per cent. interest. I do not recall of hearing of any county or any individual in Texas selling the lands on 20 years' time at as low a rate of interest as 3 per cent., payable annually."

J. H. Walker, chief clerk of the general land office, testified that his record showed that in February, 1899, there were about 28,000 acres of unsold school lands in Lamb county which were priced by the commissioner of the general land office or the Legislature at $1 for dry grazing and $1.50 for agricultural lands; that in the year 1899 the law required the state school land in Lamb county to be sold to actual settlers on condition of three years' residence; that no leases appear to have been made in Lamb county in 1899 or 1898, but have been made in some of the surrounding counties at three cents per acre.

J. B. Daniel, a real estate dealer, after having testified to long experience in dealing with real estate in the Panhandle, stated that:

"The market value of land in 1899 was the lowest I have ever known for the past 30 years. W. W. Massie purchased the Lubbock county school land about the year 1898–99 at 75 cents an acre, and it was considered one of the best tracts of land in Bailey county, and was located within 115 miles of King county school lands in Lamb county. I have been over the Lubbock county school land several times that was purchased by Massie, and regard it as four of the best leagues of land in West Texas. County school lands were offered and sold at the same price during these years. There was so little demand for land at the time defendant bought the King county school lands in 1899 that practically every piece of land on the market at that time was offered on very liberal terms. * * * The rate of interest on school lands has been 3 per cent., and on county school lands from 5 to 6 per cent. interest, and on large bodies of private lands the rate has generally been 6 per cent. during the year 1899 to 1913. The rate of interest and terms would more or less influence the

purchaser at the time stated, but at the time stated there were but few, if any, cash buyers for land, and it could only be sold on very liberal terms and low rate of interest, as the land could be leased for a period of 5 to 10 years at 3 cents per acre, which made it more desirable to lease than to buy it. I do not know of any sales of county school land having been made by any of the counties at as low a rate as 3 per cent.; the usual rate being 5 per cent."

J. O. Janes testified:

That he had resided in Lamb county since 1895; that he was a member of a stock raising firm, and not only knew, but had used, the four leagues of King county school lands since 1895 until the defendant Martin took charge of them himself; that the "King county school lands are just plains land, with considerable sand hills and tussock sandy land"; that "the King county school lands were offered for sale to one of the firm of Janes Bros. & Brown some time in the latter part of 1897 at 50 cents per acre."

The witness stated that he individually was in favor of accepting this offer, but it was declined by the firm, which did, however, accept the proposition to lease it for 2½ cents per acre." He further testified:

"The market value of King county school lands in February, 1899, was from 50 cents to $1 per acre on long terms, with low rate of interest. King county school lands in February, 1899, were not considered valuable for any purpose, except grazing. I cannot remember the date, but along about 1899 the Deaf Smith county school lands were sold at $1 per acre with 4 per cent. interest on 20 years' time. These lands were offered to my firm, and they refused to purchase. There was very little land selling in 1897, and in land deals in West Texas at that time the rate of interest depended upon the amount paid per acre for the land. When the amount paid per acre was high, the rate of interest was low, and when the rate of interest was high, the price per acre was low."

There was also evidence tending to show that the commissioners' court had placed the lands upon the market as early as the year 1895, during part of which time it had been advertised in a paper or papers; that at one time a sale had been made at $1.25 per acre but that the sale later failed. The evidence does not show any specific offer after the failure noted other than that of appellee Martin's at a higher rate than 75 cents per acre on 20 years' time at 5 per cent. interest.

On the submission of the case in argument, and in appellant's briefs, it is substantially admitted that the evidence supports the finding that the King county school lands had no greater market value than $1 per acre, but for the fact that the rate of interest required of appellee was too low; the contention being, in substance, that the inadequacy of the value, as found by the verdict, finds its demonstration in the low rate of 3 per cent. interest required of appellee instead of the higher rate alleged to be customary in sales of the kind. We therefore turn aside for the moment to consider another question in the case having relation to the contention noted.

[1-3] Appellant offered to prove by L. J. Wilson, H. H. Slayton, Tom Wilson, R. W. O'Keefe, and R. C. Ware that on February 16, 1899, the usual and customary interest charged and collected in Lamb and adjoining counties by individuals, where land was sold on deferred payments, was 6 to 8 per cent. per annum. To this evidence appellee objected as "immaterial." The objection was sustained, and the evidence excluded, to which error has been assigned. Appellee, in addition to the objection that the testimony thus offered was immaterial, also insists that it has not been made to appear that the conditions were similar, and this latter objection seems to be supported by the record; it being undoubtedly true that, before evidence of the character is admissible, it must appear that such are the conditions. City of Ft. Worth v. Charbonneau, 166 S. W. 387; Fidelity Phenix Fire Ins. Co. v. Abilene Dry Goods Co., 159 S. W. 172. But no such objection was made below, and it must therefore be rejected here. The objection that the evidence was "immaterial" certainly seems indefinite, and logically it may well be doubted whether, under any circumstances, it is sufficiently specific to require consideration, though possibly it should be held otherwise. T. & P. Ry. Co. v. Gay, 88 Tex. 111, 30 S. W. 543. But, in any event, we are not inclined to uphold it now, for we are of the opinion that the testimony offered was relevant as a circumstance to be considered by the jury, together with all the other evidence, in determining whether or not the sale to the appellee was for an inadequate price. Carver v. Power State Bank, 164 S. W. 892; Paine v. Argyle Merc. Co., 133 S. W. 895; Kocher v. Mayberry, 15 Tex. Civ. App. 342, 39 S. W. 604. So that we think, in an abstract sense, the ruling was erroneous.

[4, 5] But the further question arises of whether the erroneous ruling is of that character, under all of the circumstances, which requires a reversal of the judgment, and we have concluded that it does not. Rule 62a (149 S. W. x), having with us the force of law, provides that:

"No judgment shall be reversed on appeal on the ground that the trial court has committed an error of law in the course of a trial, unless the appellate court shall be of opinion that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment in the case."

In determining whether the ruling under consideration falls within the spirit of this rule, it may be well to observe that this suit is not one against trustees for damages for a failure to get a higher rate of interest. The proof offered is relevant only as a circumstance on the issue of fraud in the sale by the commissioners' court of King county. The proof offered only tends to show an inadequacy of price, and the latter fact in turn is but a circumstance to be considered in determining the issue of fraud. We scarcely need to cite authorities for the prop-

osition that something more than a slight inadequacy in price would be necessary to set aside the sale in question. In the light of these suggestions, and of the rule quoted, it seems to us altogether improbable that the error in excluding the testimony offered probably induced an improper verdict or judgment in the case. As will be seen by testimony already quoted, a number of witnesses gave testimony of like import. To particularize: Lester testified that in 1898 he bought the Crosby county school land at $1 per acre at 5 per cent. interest. Morrison and Slayton testified that interest on deferred payments on lands purchased from the state and counties had been from 3 to 5 per cent. Ware testified that he had been buying lands in that country for 20 years, and that "between counties or state and individuals the interest was from 3 to 5 per cent. interest." Daniel testified that "the rate of interest on school lands has been 3 per cent., and on county school lands from 5 to 6 per cent., and on large bodies of private lands the rate has generally been 6 per cent., during the years 1899 to 1913." It may almost be said that in the section of country where Lamb county is situated, and in the processes of settlement, and where, during the period from 1895 to 1906, the principal business, aside from stock raising, was the purchase and sale of lands, the usual rate of interest on land sales was a part of the common stock of knowledge of the country, and the jury, it seems to us, must be held to have had substantially all of the enlightenment that was embodied in the rejected proof. So that, on the whole, and in the light of the other testimony relating to the values of lands, we do not think, as before stated, that the ruling on the collateral subject now discussed was prejudicial.

[6] We therefore recur to the question of whether the evidence supports the jury's verdict in answer to the third and sixth special issues, and we can but think that it does. To give a brief résumé of the testimony: Daniel who testified to an experience of some 26 years in the real estate business in Western Texas, and who had sold many large bodies of land in that section, testified that "the market value of land in 1899 was the lowest I have ever known for the past 30 years." He then mentioned the sale of the Lubbock county school lands about the year 1898–99 at 75 cents an acre, stating that these lands were among the very best of the leagues of land in West Texas, and that practically all lands on the market in 1898–99 were offered on very liberal terms. Lester bought Crosby county school lands in 1898 at $1 per acre at 5 per cent. interest, payable annually. Numerous witnesses gave the value of the lands at the time as from 75 cents to $1 per acre, and Janes testified that the firm of which he was a member refused an offer of the very land in question

at 50 cents per acre in the latter part of 1897. Lay said that the price of $1 per acre, which he stated as the value of the King county lands "was upon the usual terms of sale, which was on from 20 to 40 years' time at 3 per cent. interest," further stating that he did not think that, if the lands had been advertised at the time they were sold to Martin, and other parties had been given an opportunity to bid, the lands would have brought in more than $1 per acre, with interest at 3 per cent. per annum. As before stated, notwithstanding the fact that the lands had been upon the market for a number of years, no secure bid seems to have been offered higher than the price for which the land was sold to appellee; it appearing that the highest bid that could be said to be pending at the time of the sale to Martin was but 75 cents, with interest at the rate of 5 per cent. We feel unable to say, after a consideration of all of this evidence, that the verdict of the jury, in the particulars under consideration should be set aside.

[7, 8] In the fourth, fifth, sixth, seventh, and eighth assignments of error, complaint is made of the action of the court in refusing to submit special issues requested by appellant. Appellee objects to a consideration of these assignments on the ground that the record fails to show that they were properly excepted to, as provided by the act approved March 29, 1913 (Gen. Laws 1913, p. 113). By a reference to the act it is seen that amended article 1971 provides that the charge of the court shall be in writing and submitted to the respective parties, or their attorneys, for examination and objection, and that the charge and all special charges given by the court shall be read to the jury before the argument of counsel begins. It is further provided in the act that exception shall be taken to the court's refusal to give special instructions, and that the court's ruling shall be regarded as approved, unless duly excepted to. It would therefore seem to be required that all special charges desired by counsel should be requested and acted on by the court before the charge is delivered to the jury, the evident purpose of the law being that counsel, in argument, may understand the precise issues to be determined and the exact principles of the law by which the jury are to be governed; and we find that the bill of exceptions in this case, taken to the action of the court in refusing to submit the special charges under consideration, failed to show the necessary fact that they were prepared, presented to the court, and acted on by it prior to the delivery of the charge to the jury. We would perhaps be justified, therefore, in sustaining appellee's objections and in refusing to consider the assignments because of the failure noted. See Gulf, Texas & W. Ry. Co. v. Culver, 168 S. W. 514, Ford Motor Car Co. v. Freeman, 168 S. W. 80, Heath v. Huffhines,

168 S. W. 974, and other familiar cases on the same subject. But—and we add this in view of the importance of the case—we think the assignments should be overruled on their merits.

The requested issues, briefly stated, were: First, whether the commissioners' court knew or were informed that the lands could be sold for a better price or for a higher rate of interest; second, whether the sale of February 16th was made without advertisement and without investigation of the character and value of the lands; third, whether Martin by any means induced the court to so sell the land; fourth, whether the court acted with "the purpose and intent of favoring Geo. B. Martin or in good faith for what it honestly believed were the best interests of the public free schools of King county"; fifth, whether Geo. B. Martin at the time knew the character and quality of the lands; sixth, whether the commissioners' court knew or was ignorant of the character of the lands; seventh, whether Geo. B. Martin concealed from the court his knowledge of the character of the land, or whether he fully informed the court as to the character and quality of the same, and whether the court would have agreed to sell him the land at the price had he done so; eighth, whether said J. M. Martin, the county judge, "guaranteed" Geo. B. Martin against any loss; ninth, whether Geo. B. Martin or J. M. Martin induced the commissioners' court to make the sale without advertisement and without giving other persons an opportunity to purchase, and whether or not the court did so make the sale; tenth, whether the commissioners' court exercised that degree of care and skill, prudence, and diligence which a man of ordinary care and prudence would have used in his own transactions, under like circumstances; eleventh, whether Geo. B. Martin at the time knew the court had not used such care, prudence, and diligence, and whether, had the commissioners' court used such care and diligence, they would have been able, within a reasonable time, to have sold the lands at a higher price at the same rate of interest, or for the same price for a higher rate of interest; twelfth, whether the commissioners' court had "notice" that the lands could probably be sold for a greater price than that for which they were sold; and, thirteenth, whether the commissioners' court acted in "good faith" in the sale of the lands.

By a consideration of these special issues, it will be seen that, exclusive of those substantially included in the special issues submitted by the court, they required for the most part findings upon mere matters of evidence. To illustrate: If in fact the commissioners' court sold the land without investigation of its character, without advertisement, and with notice that the land could have been sold upon more favorable terms, these were mere circumstances tending to support the general issue of fraud, which was the basis of appellant's action. Special findings upon such evidentiary matter are never required. Cushman v. Masterson, 64 S. W. 1031; Haile v. Johnson, 133 S. W. 1088. In other instances there was no evidence raising the supposed issue. For instance, no evidence is pointed out indicating that the commissioners' court either knew or were informed that King county could probably sell its lands for more than they were sold for. True, one of the witnesses testified that he mentioned to one of the commissioners a letter written by a party offering to give $1.25 per acre, but the name of the party was not given. It does not appear that the letter was in the form of a proposition, whether the party was solvent or insolvent, or anything that gave any assurance that the sale could have been so made. Nor is there any evidence tending to show that Geo. B. Martin was either called upon for information or that he concealed from the commissioners' court his knowledge of the character and quality of the land.

[9] It may be said that the fourth and thirteenth requested issues, involving the question of good faith on the part of the commissioners' court, could properly have been submitted, inasmuch as it was shown that there was no advertisement of the land immediately preceding the sale to Martin, nor had any members of the commissioners' court making the sale ever personally seen the land, and further that a relatively short time prior to February 16, 1899, the same court had sold the land to Martin at 50 cents per acre on 20 years' time, with 5 per cent. interest, the sale having been set aside by decree of a district court on the ground that the price for which the land had been sold was inadequate; that, immediately after the abrogation of this sale, the commissioners' court attempted to sell the land to Geo. B. Martin at 75 cents per acre at 5 per cent. interest; and that this attempted sale had never been effectuated by the execution of transfers. This all may tend to show, and we think does tend to show, that the commissioners' court desired Geo. B. Martin as a purchaser; the desire being explainable perhaps on the theory expressed in one of the commissioners' court's orders that Martin was a resident of the county, was well known, and solvent, and that thereby the county would be relieved of the hazard of litigation. Aside from this, however, there seems but little, if any, evidence of a fraudulent purpose on the part of the commissioners' court, as a whole, to defraud King county. While it is true there was no immediate advertisement, there had been an advertisement that availed the county nothing; while it also appeared that the members of the commissioners' court personally knew nothing of the land, there is evidence to the ef-

fect that they made inquiries of its character of cowboys and others, including a former county judge, who had visited the land for the purpose of examination. In this view of the evidence, 'and assuming it to be further true, as established by the answers of the jury to the third and sixth issues submitted by the court, that the commissioners' court, in the sale of the land, got its full market value, and that no diligence on their part would have enabled them to have secured a better price, we fail to see that the intent of the commissioners' court is material. It is undisputed that the commissioners' court had the lands on the market for a number of years, and the good faith of the court in so offering the lands for sale is not questioned by any assignment of error or by any evidence in this case. Under the circumstances and findings, therefore, an intent on the part of the commissioners' court, if conceded to be fraudulent, to favor Geo. B. Martin over another purchaser, could not constitute actionable fraud. Mr. Bigelow says (Bigelow on Fraud, vol. 1, p. 540):

"It was long since laid down that fraud without damage afforded no ground of redress in a suit for damages, and it might be added no ground of defense or of relief in equity, except by way of rescinding an executory contract."

See Lemmon v. Hanley, 28 Tex. 220; Moore v. Cross, 87 Tex. 557, 29 S. W. 1051; Blair v. Baird, 43 Tex. Civ. App. 134, 94 S. W. 116—all recognizing the principle announced by Mr. Bigelow.

On the whole, we think it can be truly said that whatever of fraud in this case the circumstances tend to prove was of no real injury to King county.

[10, 11] We have attempted to answer all of the assignments of error presented by appellant, but there is an additional finding on the part of the trial court that it would seem, in any event, answers appellant's entire case. Appellee pleaded a ratification of the sale of February 16, 1899, and the trial court, in addition to the special issues and answers thereto, incorporated in his judgment the following further finding:

"In addition to the special verdict so found by the jury, the court, from the uncontradicted evidence, finds: That theretofore, to wit, and on the 13th day of August, A. D. 1906, the commissioners' court of King county, Tex., when there was present all the members of said court, including the county judge, to wit, R. E. Lasater, county judge, E. V. Sellars, J. R. Hailey, J. W. Taylor, and T. B. Masterson, commissioners, passed and caused to be entered on the minutes of said court the following order, to wit:

"'August 13, 1906.

"'Whereas, by a certain order made and entered on the minutes of this court and shown on pages 561 and 562, volume 1, of the minutes of this court, being dated February 16, 1899, this court authorized J. M. Martin to act as a commissioner of King county, Tex., and that he make and execute to Geo. B. Martin a bond for title to four leagues of land situated in Lamb county, Tex., known as the King county school lands, on the terms and for the consideration set forth in said order; and

"'Whereas, on the 2d day of October, 1900, J. M. Martin, as county judge of King county, Tex., did make, execute and deliver to the said Geo. B. Martin a certain warranty deed wherein he conveyed to the said Geo. B. Martin leagues Nos. 230, 231, 232, and 233, Lamb county, Tex., fully described in said deed, which is recorded in volume 1, p. 210, of the deed records of Castro county, Tex., for the consideration fully set forth in said deed; and

"'Whereas, King county, by its duly authorized commissioners' court, has, with full knowledge of all the facts, continuously recognized said conveyance and transaction since the date of same, and has received the interest which has been paid thereon according to the obligation of said Geo. B. Martin and according to the order of the commissioners' court of King county, Tex., authorizing the sale to said Geo. B. Martin; and,

"'Whereas, the said Geo. B. Martin has in all things complied with the terms of his said contract with King county, and of the requirements set forth in said warranty deed so made by J. M. Martin, county judge as aforesaid, to the said Geo. B. Martin:

"'Now, therefore, it is ordered and decreed by the court that the said warranty deed so made by J. M. Martin is hereby in all things ratified and confirmed, and the title to said four leagues of land is considered to have been ever since the delivery of the deed, and is now, in the said Geo. B. Martin, subject to the vendor's lien retained in said deed to secure the payment of the unpaid purchase money for said lands. And, in order that the record title of the said Geo. B. Martin in and to said lands may be perfected, it is hereby ordered by the court that R. E. Lasater, county judge of this county, be and is hereby fully authorized and empowered to make to the said Geo. B. Martin the deed of this county containing a copy of this order, said deed to be executed and delivered to the said Geo. B. Martin, as a ratification of said deed heretofore made as above set forth, and in consideration of the sum of $1 to be paid by the said Geo. B. Martin.'"

It is undisputed that County Judge R. E. Lasater made, executed, and delivered to Geo. B. Martin the ratification deed above authorized; that he made due report thereof, which report was in all things confirmed. It is also undisputed that from February 16, 1899, until the date of the ratification deed above mentioned, and ever since, Geo. B. Martin has duly and regularly paid the interest accruing upon his obligation for the King county school lands, and that such interest has been received and presumably distributed by the commissioners' court of King county as directed by law. It is further undisputed that the court thus ratifying the original sale of February 16, 1899, was composed of an entirely different membership, and the good faith of this action upon the part of R. E. Lasater and his associated commissioners has not been attacked by any assignment of error. There is evidence also tending to show that, before the ratification order was entered, inquiry was made of the sale in 1899. In view of all which we think it must be held that the original sale to Geo. B. Martin in February, 1899, was in effect relieved of further attack. As between individuals, it cannot be disputed that fraud does not ipso facto render a conveyance effected thereby null and void. The fraud merely

affords a ground for the rescission. If the King county school land were originally placed upon the market in good faith, and if, after the sale of 1899 to Geo. B. Martin, the commissioners did in good faith, after such investigation as they saw proper to make, ratify and confirm the warranty deed made by J. M. Martin, we see no reason why the ratification deed, unimpeached as it is, does not confer full title free from further attack on the part of King county. By the Constitution and laws, absolute title to the lands in question was vested in King county, and King county, and not the members of the commissioners' court, was, by the terms of the Constitution, made the trustee of the lands and of the funds arising therefrom for the benefit of the public free schools. The law also provides expressly that the counties of this state are bodies politic and corporate, with power to sue and be sued, and such counties act by their several commissioners' courts and are bound, we think, by the good faith acts of that court when performed within the scope of its authority. That the commissioners' court of King county had the power to make the sale of the King county school lands, and had the power to direct the execution of a transfer thereto, is not questioned, and we can but think that the execution of the ratification deed by virtue of the ratification order in August, 1906, was within the scope of the powers of the court, and that such deed concludes all inquiry into the validity of the antecedent transactions. See Vernon's Sayles' Tex. Civ. Stat. art. 1365; Comanche County v. Burks, 166 S. W. 471; Smith v. Town of Anson, 160 S. W. 114; Gallup v. Liberty County, 57 Tex. Civ. App. 175, 122 S. W. 291; Carter-Kelly Lumber Co. v. Angelina County, 126 S. W. 293; Waggoner v. Wise County, 17 Tex. Civ. App. 220, 43 S. W. 836.

It is accordingly ordered that the judgment below be in all things affirmed.