PADGETT et al. v. YOUNG COUNTY et al.
(No. 8748.)

(Court of Civil Appeals of Texas. Ft. Worth. Jan. 19, 1918. On Rehearing, May 18, 1918.)

1. BANKS AND BANKING ⟐⟐119—DEALINGS— RELATION BETWEEN BANK AND DEPOSITOR.
By a deposit in a bank, the relation of creditor and debtor is created.

2. BANKS AND BANKING ⟐⟐148(1)—PAYMENT ON FORGED CHECK.
A bank cannot charge against a depositor the payment of any check with the forged signature of the depositor.

3. BANKS AND BANKING ⟐⟐148(2)—PAYMENT ON FORGED INDORSEMENT.
A bank cannot charge against a depositor the payment of any check upon the forged indorsement of the payee.

4. BANKS AND BANKING ⟐⟐148(2)—DEPOSITS —PAYMENT OF FORGED OR ALTERED CHECKS.
Where a bank check is drawn in favor of a fictitious payee, whom the drawer in good faith and without fault believes to be a real person, and such check is fraudulently indorsed by another in the name of the payee, the payment thereof cannot operate as payment of any part of the bank's debt to the depositor.

5. COUNTIES ⟐⟐204(1)—COUNTY COMMISSIONERS—DELEGATION OF AUTHORITY—AUDITING CLAIMS.
The duty of the county commissioners to audit all claims against the county, and to order paid only those found to be just, as imposed by Vernon's Sayles' Ann. Civ. St. 1914, art. 2241, subd. 8, is judicial, and its performance cannot be delegated to another.

6. COUNTIES ⟐⟐204(1) — OFFICERS — UNAUTHORIZED APPROVAL OF CLAIMS—RATIFICATION.
Since the duty of the county commissioners to audit all claims against the county is judicial and nondelegable, they are without authority to ratify the acts of the county judge in approving such claims.

7. COUNTIES ⟐⟐168(1) — OFFICERS — NEGLIGENCE CAUSING LOSS—JOINT AND SEVERAL LIABILITY.
Where a county judge approved fictitious claims against the county, on which the county clerk issued warrants on which, in turn, the county treasurer issued checks, which, after payees' signatures were forged, the county depository bank paid, and the county commissioners, after discovery of the fraud, took no steps to hold the bank accountable, the bank's payment was not the sole proximate cause of loss, and all such officers are jointly and severally liable therefor.

8. COUNTIES ⟐⟐168(5) — OFFICERS — NEGLIGENCE—STATUTE—TREASURER.
Vernon's Sayles' Ann. Civ. St. 1914, art. 2452, providing that the treasurer shall not be liable for loss caused through the negligence of any depository, does not excuse a treasurer for his negligence in issuing checks on unauthorized warrants, contributing, with the depository's negligence, to loss to the county through the depository's payment of such checks.

9. SUBROGATION ⟐⟐11—COUNTY TREASURER— LOSS THROUGH COUNTY DEPOSITORY.
Where a county treasurer negligently issued checks to fictitious persons upon unauthorized warrants, which checks the county depository bank paid upon forged indorsements, the treasurer could not be subrogated to the county's rights against the bank, since public policy forbids that he profit by his own negligence.

---

⟐⟐For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

10. COUNTIES ⊙⫛222—OFFICERS—NEGLIGENCE
—TREASURER—FORGED CHECKS.

Although the failure of the county treasurer to examine his returned checks and discover the forged indorsements was not specifically alleged by plaintiff county as negligence, it was a circumstance to be considered under the general allegation of negligence in the payment of fraudulent claims, particularly where there were 143 forged checks.

11. APPEAL AND ERROR ⊙⫛1040(10) — HARMLESS ERROR—PLEADING.

In a suit by a county to recover from its treasurer for money unlawfully paid, the overruling of an exception that the petition failed to properly identify the warrants, if error, was harmless, where it does not appear appellants were surprised or deprived of opportunity to present evidence in rebuttal.

12. LIMITATION OF ACTIONS ⊙⫛22(8) — TWO-YEAR STATUTE—SUIT ON COUNTY TREASURER'S BOND.

In a suit by the county upon the treasurer's bond for loss occasioned by his violation of official duty, the statute of limitation of two years is not applicable.

### On Rehearing.

13. COUNTIES ⊙⫛222—OFFICERS—LIABILITIES ON OFFICIAL BONDS—PLEADING AND PROOF —VARIANCE.

In an action on a treasurer's bond, that the petition alleged the warrants drawn by the clerk were paid by the treasurer, while the proof showed the treasurer issued checks on the county depository therefor, is immaterial, where no objection to such evidence was made upon trial.

Appeal from District Court, Clay County.

Suit by Young County, Tex., against I. B. Padgett and others, in which the Graham National Bank and its sureties were also made defendants. From a judgment for plaintiff against the original defendants, and denying the latter recovery against the bank and its sureties for the amount of such judgment, the original defendants appeal. Affirmed.

Taylor, Allen & Taylor, of Henrietta, and I. W. Stephens and Miller & Miller, all of Ft. Worth, for appellants. P. A. Martin, John C. Kay, J. W. Akin, and Carrigan, Montgomery & Britain, all of Wichita Falls, for appellees.

DUNKLIN, J. In November, 1910, I. B. Padgett was duly elected county treasurer of Young county for a term of two years; and having filed with the commissioners' court of the county a bond as such officer, in compliance with statutory requirements, he entered upon the duties of his office, and held the same under that election for the period of two years, and all the transactions hereinafter mentioned occurred during that term of his office. The Graham National Bank was the county depository, having been duly selected as such by the commissioners' court of the county and having given a bond for the faithful discharge of the duties as such, all in compliance with chapter 2, tit. 44, of Vernon's Sayles' Texas Civil Statutes of 1914.

The county instituted this suit against Padgett and the sureties upon his official bond to recover the amounts paid out by the bank upon 143 checks drawn upon it by Padgett as county treasurer. The checks were issued upon warrants, drawn upon the treasurer by the county clerk, and in plaintiff's petition it was alleged that both warrants and checks were fraudulently issued without any consideration therefor, and without lawful authority, and that Padgett was guilty of negligence in issuing said checks, which was the proximate cause of the loss of the money paid thereon, and that he and his bondsmen were liable to the county for the amounts paid out by the bank upon those checks.

In addition to their plea of general denial and special answers in reply to plaintiff's suit, Padgett and his bondsmen filed a plea over against the bank, and prayed for judgment against it for whatever judgment that might be rendered against them, basing such prayer upon allegations that the bank negligently, and in violation of its statutory obligation to the county, paid said checks upon forged indorsements, without exercising any care to ascertain the rightful owners of such checks, and that such negligence was the sole proximate cause of the loss to the county, if the county sustained any loss at all by the payment of the checks. From a judgment in favor of the county against Padgett and his bondsmen, and denying them a recovery over against the bank, they have prosecuted this appeal.

The trial was before the court without the aid of a jury, and the trial judge filed findings of facts and conclusions of law. We shall not undertake to set out those findings in full, as they cover some 20 pages in the transcript, but we shall confine ourselves to a statement of the substance only of those which are material to the assignments hereinafter discussed.

In addition to the facts already stated, the findings show that D. D. Cusenbary was the duly elected and qualified county clerk of Young county during the term of office of Padgett. During the years 1911 and 1912 all the funds belonging to Young county were deposited in the Graham National Bank of Graham as county depository. On divers dates, beginning February 16, 1911, and ending on October 30, 1912, Cusenbary, as county clerk, issued 143 county warrants upon fictitious claims in favor of fictitious and three real persons, and drawn upon Padgett as county treasurer. Upon those warrants the 143 checks were drawn by Padgett as treasurer upon the Graham National Bank as county depository. The checks were drawn payable to the order of the persons named in the warrants, and each for the same amount named in the warrants corresponding thereto. The warrants were drawn by the clerk upon the order of E. W. Fry, as county judge

of Young county, and they recited upon their face that they were drawn upon his order instead of by order of the commissioners' court. The warrants recited that they were to be paid out of the road and bridge fund of the county and were duly signed by the county clerk. The purported claims represented by the warrants were never presented to nor audited by the commissioners' court, but Cusenbary in issuing them acted in good faith, believing that the county judge had the authority to audit and approve the claims. He further believed, in good faith, that the accounts were for services rendered Young county by persons in whose names the warrants were drawn. The warrants so drawn aggregate the sum of $7,317.90, and all were in favor of fictitious persons or bearer, except three, which were in favor of real persons or bearer, but without their knowledge; but the county clerk, in issuing the warrants, in good faith, believed that the payees in such warrants were all real persons and entitled to receive them. The warrants were issued upon request of E. W. Fry, the county judge, and upon fictitious claims filed by him, and were delivered to him, and he receipted for them in his own name, and wrote the name of "Fry" on the back of most of them, but the names of the payees therein were not indorsed on them by any one.

After so doing, he, in person, presented them to the county treasurer and obtained from him the corresponding checks. When the treasurer issued the checks and delivered them to Fry, he did not require a receipt therefor to be written across the face of the warrants, as was done when 1,647 other warrants, not in issue in this suit, were honored by him. He believed in good faith that the warrants were valid, and that Fry was acting for accommodation of the payees named in them, and was sending the checks to them, but never made any inquiry to discover whether he did so. He did not require Fry to show any authority from the payees named in the warrants to receive checks therefor, nor any receipt from him therefor as their agent or attorney in fact; nor did Fry claim to be their agent or attorney in fact, but merely claimed to be sending out the checks to the payees for their accommodation. Padgett did not claim any acquaintance with such persons as those named in the warrants, neither did he make any inquiry as to their identity nor as to Fry's authority to represent them at the time he issued the checks. Some of the checks were presented to the bank by Fry and collected by him, while others were negotiated by him to merchants and other persons residing in Graham, who later presented the same to the bank, with their indorsements added, and collected them. When presented to the bank all the checks had indorsed thereon, in Fry's handwriting, the names of the payees, said indorsements all being fraudulently made by Fry for the purpose thereafter accomplished of collecting them, and he also indorsed his own name thereon.

When Fry procured the warrants from the clerk and the checks issued thereon from the county treasurer, and when he collected those presented by him to the bank, he represented to each of those officials that he was attending to the collection of the claims for the accommodation of the purported owners, and the county clerk, county treasurer, and the officials of the bank paying those checks presented by Fry believed in good faith that said representations were true, and, in paying all the checks, the officials of the bank believed they were genuine, and that the indorsements of the names thereon were genuine. The officials of the bank, before paying the checks, made no investigation whatever to discover whether or not the indorsements of the names of the payees were genuine, but relied solely upon the indorsements of the last indorsers who collected them.

On April 1, 1908, and during the incumbency in office of a former county judge, the commissioners' court of the county, by order duly entered upon its minutes, employed one Sam Copeland as foreman of certain public road work, and agreed to pay him for his services a salary of $60 per month. It was further stipulated in the order that the county clerk should pay Copeland $60 per month, as called for in his contract, and also the men that might be employed by him to assist in the work of grading the public roads, whenever such accounts should be approved by the county judge of Young county. In compliance with that order the warrants were issued for the work done under and by virtue of that contract, without any audit of such claims by the commissioners' court, but solely upon the approval of the county judge. Thereafter it became the custom for the county clerk to issue warrants upon the approval of similar claims for work done generally upon the county roads, the warrants being issued solely upon the approval and order of the county judge, and without any audit or approval thereof by the commissioners' court; and in issuing the warrants in controversy Cusenbary followed that custom, in good faith, believing that the county judge had lawful authority to approve such claims and to order the issuance of the warrants without previous investigation or approval of the claims by the commissioners' court. During Fry's incumbency in office the county clerk, county treasurer, and county commissioners, and officials of the Graham National Bank, all had implicit confidence in his honesty and integrity, and his general reputation in that respect in Young county was good. Many other checks not questioned in this suit were issued upon warrants drawn at the instance of Fry as county judge without any audit of the claims by the commissioners' court, the same as the warrants in question here; but those warrants were in the names of real persons, and upon just claims, and the checks

drawn thereon were paid off by the depository and charged to the county, and have never in any manner been questioned. During Padgett's term of office the Graham National Bank, as county depository, rendered to him monthly statements of the account of the county treasurer with the county depository, and with said monthly statements returned all checks which had been presented to and paid by the bank and which were charged against the county. Padgett in turn made regular quarterly reports, as required by law, to the commissioners' court, showing all receipts and disbursements during the quarter, and in said reports the serial numbers of all warrants issued during the quarter were shown, and also the names of all persons in whose favor they were drawn, and the amounts and dates of the same, including the warrants and checks in controversy.

Those reports were examined by the commissioners court at its regular meetings at the end of each quarter, and were regularly approved by the court by proper orders entered in its minutes, and at the time of the examination of said reports each of the county commissioners knew of the custom of Fry to order the issuance of warrants in vacation upon claims audited by him alone, and that warrants had been issued in accordance with that custom. When said reports were approved, the warrants in question here were duly canceled, after being exhibited to the court, and Padgett, as county treasurer, was given credit by the court with all warrants so taken up and canceled, including those in controversy. The county has never in any manner been reimbursed for the amount of the checks in controversy so paid out and credited to the county treasurer.

The court further found that when the checks were returned to Padgett by the bank, after they had been paid, that:

"The said I. B. Padgett did not examine the indorsements on said checks, or on either of them, but placed them, with the reports which accompanied them, in a box upon the top of the safe, in the vault of his office, in the month of November, 1913. If he had examined the indorsements on said checks, he would have ascertained that all of the checks which had been issued for the warrants described in plaintiff's petition herein bore the indorsements of E. W. Fry after the indorsement of the names of the several persons to whose order they were issued, and before the indorsement of the person who presented them to the bank to be honored and paid, if they were presented by other than E. W. Fry, and would have been led by such discovery to make inquiry concerning the genuineness and indorsement of the payee of said checks, which inquiry would probably have resulted in the refusal of said county treasurer to deliver any other checks payable to other persons to the said Fry, and would probably have uncovered his scheme to defraud Young county.

"(19) In the month of January, 1915, the commissioners' court of Young county, Tex., employed an auditor to audit the books of Young county, and turned over to him the books and records of said county, and all of the quarterly reports made by the said I. B. Padgett during his two terms of office as county treasurer of Young county, Tex., and all of the warrants issued by the county clerk of Young county on said county treasurer, and taken up by him during his said two terms of office, including those described in plaintiff's petition herein, and all of the checks which had been issued for said warrants by the said I. B. Padgett, including those issued for the warrants described in plaintiff's petition, bearing the indorsements of E. W. Fry, in addition to the forged indorsements of the names of the several payees in said checks. On February 3, 1915, the auditor so employed reported to the commissioners' court of Young county, Tex., that the indorsements of the names of the payees on the 143 checks issued by the said Padgett on the said county depository for the 143 warrants described in plaintiff's petition were forgeries, and that such forgeries were committed by E. W. Fry. The said court did not present the said checks to the Graham National Bank of Graham, Tex., the said county depository, and demand credit for them, and did not notify the said bank that the indorsements of the names of the original payees on said checks were forgeries, and did not notify defendant I. B. Padgett that such indorsements were forgeries, and has never notified the said bank that said indorsements were forgeries, and has never demanded of the said bank credit for the amount of said checks bearing such forged indorsements.

"(20) The plaintiff herein did not notify the defendant I. B. Padgett just what checks so issued by him for the warrants described in plaintiff's petition bore forged indorsements until the filing of the first amended petition on, to wit, the 5th day of August, 1915, and on the 4th day of August, 1915, the defendant Graham National Bank of Graham, Tex., and the sureties on its bond as county depository of Young county, Tex., except Cicero Smith, were made defendant herein upon the pleadings of the defendant I. B. Padgett and the sureties on his bond as county treasurer, upon their prayer in the alternative to recover judgment against said bank for the amount they might be compelled to pay to Young county in this suit, by reason of being subrogated to the rights of said county against said bank. When the said I. B. Padgett was a witness before the grand jury selected for the March term, 1915, of the district court of Young county, Texas, and questioned regarding criminal offenses committed by E. W. Fry, he was advised that some of the said checks bore forged indorsements of the payees named in them, but he was not advised of the list of said checks whose indorsements were forged, and the said checks were not delivered to him, and he had no opportunity to tender them to the said bank; that said Padgett saw all of the forged checks, and examined some of them while in the grand jury room in March, 1915. Said Padgett gave no notice to, and made no demand upon, the Graham National Bank on account of such forgeries until he filed his cross-action on August 4, 1915.

"(21) About the 5th of February, 1915, E. W. Fry, who was then a member of the Texas Legislature from the representative district composed of Young and Jack counties, in the state of Texas, was arrested charged with the forgery of six checks, none of which are checks issued for the warrants described in plaintiff's petition. The fact that such arrest and charges were made was notorious in Graham, Tex., and Young county, and came to the notice of the officers and agents of the said Graham National Bank, but such bank had no knowledge upon what such charges were based.

"(22) At the time of said arrest of the said E. W. Fry, he was possessed of real and personal property consisting of his homestead in the town of Graham, of two tracts of land aggregating 640 acres in Young county, and 27 horses and mules, of the aggregate value of at least $10,000 in excess of the incumbrances upon them. Prior to the time of the convening of the

district court of Young county, Tex., in March, 1915, the said Fry disposed of all of said property except one tract of land, which he disposed of in the month of May, 1915. Had the Graham National Bank, the said county depository, been advised that the indorsements on the said checks issued for the said warrants described in plaintiff's petition were forgeries, at the time the commissioners' court of Young county, Tex., ascertained they were forgeries, it would have sought legal counsel, and would probably have brought suit against the said Fry, and levied writs of attachment on the said real and personal property owned by him, and would have tried to induce him to convey to it his homestead for its protection, and to secure for them security from his friends, of whom he then had quite a number who were rich and influential.

"(23) I further find that at the time the said county officers were fully informed of the alleged forgeries that the said E. W. Fry was possessed of real and personal property situated in Young county, Tex., of the reasonable market value of ten thousand dollars over and above all mortgages and incumbrances of every character thereon. I further find that on the 12th day of February, 1915, E. W. Fry sold and conveyed 160 acres of land which he had owned on February 3, 1915. I further find that on February 2, 1915, the said E. W. Fry sold and conveyed 160 acres of land which he had owned on February 3, 1915. I further find that on May 5, 1915, the said E. W. Fry sold and conveyed 213⅓ acres of land which he had owned February 3, 1915. I further find that on February 12, 1915, said E. W. Fry sold and conveyed certain lots, including his homestead in the town of Graham, Tex., which he had owned on February 3, 1915. I further find that said E. W. Fry on February 12, 1915, sold and conveyed an abstract business, consisting of abstract books, fixtures, owned by him on February 3, 1915. I further find that said E. W. Fry, before the Graham National Bank ever knew or was informed of said alleged forgeries, conveyed certain property, consisting of horses and mules, belonging to him.

"(24) Young county, acting by and through its commissioners' court and attorneys by it selected, on February 13, 1915, filed a suit in the district court of Young county, Tex., against E. W. Fry, D. D. Cusenbary, I. B. Padgett, and the sureties on his official bond, also the sureties upon the official bond of E. W. Fry and D. D. Cusenbary, who were respectively county judge and county clerk of said county, and that in said suit the defendant Graham National Bank was not made a party, nor were the sureties on its bond made a party, and in said suit a judgment was sought against the parties therein named, and the allegations were to the effect that at divers times the defendant Fry, who was county judge of Young county, Tex., in pursuance of a scheme to cheat and defraud the plaintiff county, without lawful authority, applied for and received from his codefendant, Cusenbary, county clerk, certain county warrants amounting to a large sum, a large number of said warrants being drawn against the road and bridge fund and the general county fund of said county, aggregating in all the sum of $26,000, and that various and sundry pretexts and pretenses were used by said Fry to secure the possession of said warrants from said Cusenbary, county clerk, he, the said Fry, well knowing that said warrants could not be legally issued until accounts had been filed for the same and the commissioners' court had allowed such accounts and ordered the issuance of the warrants, and that said Cusenbary issued said warrants without lawful authority, and delivered the same to said Fry, well knowing that the same had not been ordered by the commissioners' court, and that a large number of said warrants were issued in the names of fictitious persons, and that said Cusenbary, by ordinary diligence, could have known that said Fry

was not entitled to receive said warrants. That the said Fry, having procured said warrants, took the same to the defendant I. B. Padgett, county treasurer, and presented the same for payment, and that the said Padgett accepted said warrants and issued his checks as county treasurer to cover the same, and that the said Fry was then and there thereby enabled to and did secure a large number of checks and drew a large sum of money out of the county depository, aggregating the sum above set out, and that said Fry converted said money unlawfully to his own use. The said petition contains various other allegations, but the above allegations were the basis of the suit. That said petition nowhere disclosed the names of the persons to whom said warrants upon their face were issued, nor the names of the persons to whom said checks were issued, nor the amounts of said checks, nor was the same shown by any list or exhibit attached thereto.

"(25) The said I. B. Padgett, county treasurer, and the sureties on his bond, filed their original answer at the March term, 1915, of the district court of Young county, Tex., and in said answer pleaded that there was a misjoinder of causes of action and parties defendant, and general and special exceptions and other defenses, but did not by said answer even ask that the Graham National Bank be made a party defendant. That subsequently, on August 4, 1915, the said I. B. Padgett, defendant in said suit, filed an amended original answer, when for the first time the Graham National Bank was made a party defendant. That prior to the filing of said cross-action against it the Graham National Bank did not know, and had not been informed by I. B. Padgett or any other person, of the checks which it is alleged were cashed by it upon forged indorsements, and had no definite information whatever as to the facts with reference to the said alleged forgeries, but if it had any information it was mere rumors. I further find that prior to the filing of said cross-action against the Graham National Bank, it never had any knowledge of the checks upon which it was claimed indorsements were forgeries, either from I. B. Padgett or from any other person, and that never, prior to that time, did it have any such knowledge or information as was sufficient to base an action on its part against said E. W. Fry."

"Conclusions of Law.

"First. I find that the names of the payees in the warrants and checks were, in law, fictitious— that is, were what the law would term fictitious persons—and that the indorsements of the payees' names on the backs of the checks introduced in evidence was a forgery in each instance, and that through the means of such forgery E. W. Fry was enabled to secure the funds sued for in plaintiff's petition out of the county depository.

"Second. I find that the county treasurer, I. B. Padgett, defendant, was guilty of negligence as charged in the plaintiff's petition in delivering the checks to the said E. W. Fry to secure the county's money, and was negligent in this and in all the transactions, in the following manner: (a) Defendant I. B. Padgett was guilty of negligence, and of negligence per se, in delivering said check to the said E. W. Fry without requiring the said E. W. Fry to receipt for or write the payee's name across the warrants, or indorse the same, and that the payment of such warrants without indorsement was negligence. He was negligent in delivering the checks to any other person than the payee named in the warrant or his duly authorized agent or attorney in fact. (b) I find that I. B. Padgett was guilty of negligence in receiving from said E. W. Fry such a large number of warrants, delivering to him such a large number of checks, in failing to ascertain Fry's authority

to handle such warrants and such checks. (c) I find that I. B. Padgett was guilty of negligence in writing such a large number of checks payable to fictitious payees, upon warrants payable to fictitious persons, in that he failed to make any kind of inquiry as to who said payees were, and as to why the county was indebted to said fictitious payees in such large sums of money. (d) I find that I. B. Padgett was guilty of negligence, and in failing to discover for a period of more than two years that this fraud was being perpetrated by said E. W. Fry when the county depository made its monthly reports to him, and in so doing he had opportunity to discover that E. W. Fry had personally written his name upon each one of such checks, and appeared as a last indorser on same, cashed said checks, and had presumably gotten the benefit of the money. (e) I further find that I. B. Padgett was guilty of negligence in paying and delivering to the county judge, E. W. Fry, the checks, in that the warrants themselves were fraudulent and void, as fully appears from their face, having been issued without authority of the commissioners' court."

"Third. I find that article 2452, Vernon's Sayles' Civil Statutes, provides as follows: 'Nothing in this chapter shall release any county treasurer from any loss resulting from any official misconduct or negligence on his part.' And I find that this loss to the county resulted from the negligence of said I. B. Padgett in the particulars above mentioned."

"Fourth. I find that the negligence of the said I. B. Padgett constituted a breach of his official bond as treasurer of Young county, Tex., rendering both him and his official bondsmen liable to the county for the loss resulting from said negligence on his part."

### "Conclusions of Law.

"As to the issues between I. B. Padgett, county treasurer, and the sureties on his bond, and the Graham National Bank, upon the facts hereinbefore found, I conclude, as a matter of law, that, if the said Young county ever had a cause of action against the Graham National Bank by reason of its payment of the checks upon forged indorsements, that by reason of the acts and conduct of its commissioners' court and their officers, as fully set out in the findings of fact, has estopped itself to claim or recover anything against the bank by reason of payment of said checks upon forged indorsements.

"In my judgment and opinion it was the clear legal duty of the commissioners' court of Young county, and its county judge and county attorney, when they became fully informed of the facts with reference to the alleged forgeries, to have at once fully disclosed to the said Graham National Bank all of the facts within its possession, and have given the Graham National Bank an opportunity to have, by action or otherwise, recovered from E. W. Fry the amount paid by it upon said forged indorsements, and that having failed and refused to disclose said facts, and having in effect concealed the same, and the said E. W. Fry having in the meantime disposed of a large amount of property, I am of the opinion that the bank has been so prejudiced as to make it unjust and inequitable that the county should have or recover anything against the bank, the county by its acts being estopped; and as the defendants I. B. Padgett and the sureties on his bond are merely seeking to recover against the bank on the theory that they were subrogated to the rights of the county, I am of the opinion that the county having lost whatever right it had, that there was no right to which Padgett and his bondsmen could be subrogated, and for these reasons render judgment that Padgett and the sureties on his bond take nothing against the bank by reason of the said cross-action, and that the bank and said sureties on its bond recover their costs."

[1-3] It is well settled that by a deposit in bank the relation of creditor and debtor is thereby created between the depositor and the bank, and that the bank cannot charge against the depositor the payment of any check with the forged signature of the depositor or upon the forged indorsement of the payee.

[4] And if a check is drawn upon the bank in favor of a fictitious person, but whom the drawer in good faith and without fault upon his part believes to be a real person, and such check is fraudulently indorsed by another in the name of the payee, such indorsement is a forgery, and the payment of the check cannot operate as a payment of any part of the debt owing to the depositor.

We shall undertake to cite only a few of the many authorities announcing those general rules. Van Winkle Gin Co. v. Citizens' Bank, 89 Tex. 153, 33 S. W. 862; Rolling v. E. P. & S. W. Ry., 127 S. W. 302; Wells Fargo & Co. Express v. Bilkiss, 136 S. W. 798; Harmon v. Old Detroit Natl. Bank, 153 Mich. 73, 116 N. W. 620, 117 L. R. A. (N. S.) 514, 126 Am. St. Rep. 467; Hatton v. Holmes, 97 Cal. 208, 31 Pac. 1131.

By subdivision 8 of article 2241 it is made the duty of the commissioners' court "to audit and settle all accounts against the county and direct their payment." Chapter 2, title 44, V. S. T. C. Statutes, provides for the selection of some "banking corporation, association, or individual banker" to act as a depository of the funds of the county; and by article 2444 it is made the duty of the county treasurer to turn over to the county depository, as soon as it has been selected and has qualified by giving the necessary bond as such, all moneys coming into his hands. By article 2443 the depository selected is required to give bond—

"conditioned for the faithful performance of all the duties and obligations devolving by law upon such depository, and for the payment upon presentation of all checks drawn upon said depository by the county treasurer of the county and that said county funds shall be faithfully kept by said depository and accounted for according to law."

Article 2449 of the same chapter provides that—

"it shall be the duty of the county treasurer, upon the presentation to him of any warrant drawn by the proper authority, if there shall be money enough in the depository belonging to the funds upon which said warrant is drawn and out of which the same is payable, to draw his check as county treasurer upon the county depository in favor of the legal holder of said warrant, and to take up said warrant and to charge same to the fund upon which it is drawn."

Article 2452 reads:

"The county treasurer shall not be responsible for any loss of the county funds through the failure or negligence of any depository; but nothing in this chapter shall release any county treasurer for any loss resulting from any official misconduct or negligence on his part, or from any responsibility for the funds of the county, until a depository shall be selected and the funds

deposited therein, or for any misappropriation of such funds by him."

As shown by the uncontroverted proof and findings of fact by the trial judge, the commissioners' court never audited the fraudulent and fictitious claims upon which the county clerk issued the warrants and upon which warrants the treasurer later issued the fraudulent checks, which were paid by the county depository; but such warrants, as shown upon their face, were issued solely upon the order of the county judge. The order of the commissioners' court, passed some three years prior thereto, authorizing a former county judge to audit labor claims for work then being done on the public roads under a particular contract, and to direct the clerk to issue county warrants in favor of the holders of such claims as said judge might approve, did not purport to confer, and could not in any event confer, such authority to County Judge Fry to order the issuance of the county warrants now in question. The action of the county clerk in issuing such warrants without an order of the commissioners' court, made after an audit and approval by it of the fraudulent labor claims, was a clear violation of his statutory duties, and was negligence on his part as a matter of law.

And we are of the opinion that the findings by the trial judge that Padgett, the county treasurer, was guilty of negligence in issuing the checks upon those warrants are all supported by the evidence. The action of the bank in paying the checks upon forged indorsements, and charging them to the county, was clearly negligence, as a matter of law, because they were in violation of the plain statutory duties of the depository, as well as a breach of the common-law duty owing to the county as its depositor. The mere payment of the checks did not operate as any loss to the county, since the county commissioners had the undoubted right to repudiate any liability therefor, and to refuse any credit to the depository based on their payment; and, when the vice in the checks was first discovered by the commissioners, the county had not then sustained any loss by reason of their payment, for the county commissioners then had the right, and it was their legal duty, to revoke the credits they had already allowed for such payments, and to hold the bank liable for the amounts of such credits.

For some reason not disclosed by the record, the county commissioners, after they discovered that the checks and warrants were all fraudulent, did not elect to pursue this plain and simple duty, but elected to treat as valid and legally binding upon the county the credits so given to the depository for payment of the checks, and to look to the treasurer alone as liable for the loss.

All parties to the suit, as well as the trial judge, have proceeded upon the theory that the action of the commissioners' court in approving the payment of those checks is now legally binding upon the county, barring any right to demand reimbursement from the bank by reason of the failure of the commissioners to take proper steps to annul such order. If that be true, then such violation of official duty by the county commissioners, operating in conjunction with the violation by the county clerk, treasurer, and the depository of their respective official duties, also was the culmination of the loss to the county.

[5, 6] The duty imposed by statute upon the county commissioners to audit all claims against the county and to order paid those only which are found to be just and legal demands, was judicial in its nature, and its performance could not be delegated to another, since it is well settled in this state that an order of the commissioners' court allowing a claim against the county and directing its payment is, in effect, a judgment, and just as conclusive as a judgment rendered by any other trial court acting within its jurisdiction. Callaghan v. Salliway, 5 Tex. Civ. App. 239, 23 S. W. 837; August A. Busch & Co. v. Caufield, 135 S. W. 244. If the county commissioners had no power to so delegate the performance of that duty, they had no authority to ratify the acts of the county judge in assuming the discharge of that duty himself. McKinney v. Robinson, 84 Tex. 489, 19 S. W. 699; School Trustees v. Farmer, 23 Tex. Civ. App. 39, 56 S. W. 555.

The authorities relied on by appellants to sustain their contention that the commissioners ratified the action of the clerk in issuing the warrants are such as Boydston v. Rockwall County, 86 Tex. 234, 24 S. W. 272; King County v. Martin, 173 S. W. 960; Elliott on Contracts, § 456; Mechem on Agency (2d Ed.) § 367. Those authorities announce the general rule to be that, when the governing body of a municipal corporation is authorized to perform an act which is purely administrative in its character, such body may ratify the unauthorized performance of the act by another. But they have no application here, for the reason that the duty to audit claims against the county is not ministerial but is judicial, as has been said already. Furthermore, the only contention urged that the commissioners' court did ratify such action of the county judge is the fact that they approved the reports of the depository and county treasurer, which showed payment of the fraudulent checks in controversy, and that such payments were charged against the county. But it is quite clear from the record that in so doing they were acting upon the custom followed ever since the passage of the order of the commissioners' court in 1908, referred to above, to delegate to the county judge the duty of auditing and allowing all such claims, and that they accepted his action in such matters as lawful and made no in-

vestigation whatever of such claims themselves.

Hence it cannot be said that there was a lawful ratification by the commissioners' court or the unauthorized action of the county judge in ordering the issuance of the warrants, or of the county clerk in issuing them, or of the treasurer in giving checks therefor, or of the payment of those checks by the bank.

[7] It is true, as said already and as contended by the treasurer and his bondsmen, that the payment by the bank of the checks upon the forged indorsements did not, of itself, cause the county any loss, since the same could not be lawfully charged against the county. But we overrule the further contention that the negligence of the bank in paying the checks was the sole proximate cause of the loss. It is clear from the record that the failure of the county commissioners, after discovery of the fraud practiced, to take proper steps to hold the bank accountable for credits already allowed it for the checks, was a failure to perform a plain official duty, and that such negligence and the prior negligence of the clerk in issuing the warrants and that of the treasurer in issuing the checks thereon, and that of the bank in paying them, was each a contributing cause of the loss, and in the absence of which the loss would not have occurred, and that all of those officers were jointly and severally liable therefor. 29 Cyc. 496 to 499.

In Jordan-Marsh Co. v. Nashville Shawmut Bank by the Supreme Court of Massachusetts, and reported in 201 Mass. 397, 87 N. E. 741, 22 L. R. A. (N. S.) 250, it was held that the negligence of the drawer of a check in delivering it to a person not authorized to receive it, and who collects it upon a forged indorsement, cannot be held to be the direct proximate cause of the payment of the check by the bank; it being held that such negligence of the drawer has nothing to do with the performance or nonperformance by the bank of its duty to see that payment is made to the right person. In addition to the decisions cited in the opinion of the court in that case, other authorities to the same effect might be added, such as Russell v. First National Bank, 2 Ala. App. 342, 56 South. 868; Rowe v. Putnam, 131 Mass. 281; Rolling v. E. P. & S. W. Ry., 127 S. W. 302, supra; Wells Fargo Express Co. v. Bilkiss, 136 S. W. 798.

In the last-cited case it appeared that the payee of a money order drawn on the express company had been careless in allowing an unauthorized person to have access to his papers, and thereby come into possession of the money order, and to collect the same upon a forged indorsement of the payee's name. The opinion in that case was rendered by Justice Fly, who disposed of the question in the following language:

"The fact that appellee may have been careless in allowing the woman access to his papers could not excuse appellant for paying the orders given by it to appellee on forged indorsements. It cannot excuse its negligence in paying the orders by showing negligence on the part of appellee in the way in which he cared for his property."

In that opinion occurs the following quotation from Tiedman on Commercial Paper, § 451:

"If the bank pays money on a forged check, no matter under what circumstances of caution, or however honest the belief in its genuineness, if the depositor himself be free of blame, and has done nothing to mislead the bank, all the loss must be borne by the bank, for it acts at its peril, and pays out its own funds, and not those of the depositor."

But the blame or acts of the depositor misleading the bank, referred to in that quotation, according to the weight of authorities, seem applicable to acts on the part of the depositor after the checks are drawn and delivered, which, under the principles of equity, would estop the depositor from denying the validity of the check, and not to the mere act of drawing and delivering the check, provided such act be in good faith and with no intention to defraud the bank. The liability of the bank, under such circumstances, seems to be predicated, not so much upon the question of negligence, but upon the absolute contractual duty to pay money drawn on the depositor's account to no one except the person lawfully authorized to receive payment.

There is no escape from the conclusion that the issuance of the warrants by the county clerk and of the checks by the treasurer did proximately contribute to the loss by the county, since there was a causal connection between those acts and the loss, and, but for each of those acts, the loss would never have occurred, and the liability of each and all of the officers of the county mentioned above is properly predicated upon the violation of their plain statutory duties.

[8] We do not think that by the provision of article 2452, copied above, "that the treasurer shall not be responsible for any loss of the county funds through the failure or negligence of any depository," it was the intention of the Legislature to excuse the county treasurer for any negligence on his part contributing, with the negligence of the depository, to such loss. We think the remainder of that article, to the effect that nothing in that chapter of the statutes should release any county treasurer for loss occurring through his negligence or official misconduct until a county depository shall be selected, clearly indicates an intention that the treasurer should be held liable for his own negligence or official misconduct under all circumstances, and to excuse him for loss occurring through the negligence of the depository, in the event only that such negligence was the sole cause of the loss. We think it would be a strained construction of the article to say that the Legislature

intended to relieve the treasurer from liability for loss of county funds after they are deposited with the county depository, even though he be guilty of some official misconduct after the depository received the funds, which proximately contributes to such loss.

Error is assigned to the failure of the court to allow appellants a recovery over against the bank, under the equitable principles of subrogation. The most familiar instance in which subrogation is allowed is in favor of a surety who pays the debt of his principal. Appellants have cited, among others, such cases as U. S. Fidelity & Guaranty Co. v. Adou & Lobit, 104 Tex. 379, 137 S. W. 648, 138 S. W. 383, 37 L. R. A. (N. S.) 409, Ann. Cas. 1914B, 667; Skipwith v. Hurt, 94 Tex. 322, 60 S. W. 423; U. S. v. National Exchange Bank, 214 U. S. 320, 29 Sup. Ct. 665, 53 L. Ed. 1006, 16 Ann. Cas. 1184. Without attempting to review those decisions in detail, we think it sufficient to say that subrogation allowed in each case was in favor of one who stood in the relation of a surety for the principal debtor.

In 37 Cyc. p. 373, following the statement that, "The ordinary equity maxims are applicable to the equitable remedy of subrogation," it is said, in substance, that the courts, especially in America, incline rather to extend than restrict the doctrine of subrogation, although conformably to the principles underlying it. On page 370 it is said that, "when two or more persons are equally liable to the creditor, if as between themselves there is a superior obligation resting on one to pay the debt, the other, after paying it, may use the creditor's security to obtain reimbursement." But on page 371, after announcing the rule to be that subrogation will be allowed only in a clear case of pure equity, the following is said: "The right is never allowed one who would thereby reap advantage in any way from his own wrongdoing, nor to relieve a party from the consequence of his own unlawful act, nor where it would be contrary to public policy. * * *"

[9] It would seem that the treasurer who drew the checks, in one sense, stood in the place of the county itself as between him and the bank. But the duty owing by the bank not to pay out funds belonging to the county upon forged checks was a duty owing primarily to the county and not to the treasurer; and even though it could be properly said, as we think it can be, that, as between the treasurer and the bank, the latter owed to the county a higher and more strict duty to protect it from the payment of forged checks than did the treasurer, yet we are of the opinion that the latter is not entitled to a recovery over against the bank, for the reason that such a recovery would be against public policy, and would be to allow the treasurer to profit by his neglect of his official duty.

[10] Although the failure of the treasurer to examine the checks after they were returned to him by the bank was not specifically alleged by plaintiff as negligence and as a separate ground of recovery, yet such failure was a circumstance which properly could be considered in support of the general allegation of negligence in honoring the warrants, especially in view of the number of warrants that were presented by Fry, and other facts and circumstances reasonably calculated to excite suspicion of a person of ordinary prudence.

[11] If there was any error in overruling such special exceptions urged by appellants to plaintiff's petition as that it failed to properly identify the warrants, or to state the dates of their payments, etc., such error was harmless, as it does not appear that appellants were surprised by any proof offered by plaintiff, or were in any manner deprived of the proper opportunity to present evidence in rebuttal thereof. Besides, a list of the fictitious warrants with their serial numbers, dates, amounts, and names of payees, etc., was attached as an exhibit to the petition.

[12] As the suit was upon the treasurer's bond given for the faithful performance of his official duties and as the recovery sought was for a violation of those duties, the statute of limitation of two years was not applicable, and there was no error in overruling appellants' special exception presenting that defense.

For the reasons indicated all assignments of error are overruled and the judgment is in all respects affirmed.

Affirmed.

CONNER, C. J., not sitting, serving on Writ of Error Committee at Austin.

## On Rehearing.

DUNKLIN, J. [13] It is true, as urged by appellants in their motion for rehearing, that in the petition in the trial court plaintiff alleged that the warrants drawn by the county clerk were paid by I. B. Padgett as county treasurer, and there was no allegation that he issued checks upon those warrants, and that the checks so drawn were paid by the county depository. Accordingly the statement contained in our original opinion, to the effect that the petition contained an allegation that Padgett took up the warrants upon checks drawn by him upon the county depository, is withdrawn for the sake of accuracy. But we do not think that such difference is material, since the essence of the complaint was that Padgett negligently caused the county's money to be paid out by honoring the warrants. Besides, we find nothing in the record to show that the proof made of the issuance by Padgett of checks upon the warrants and the payment of those checks by the depository was objected to by defendants on the

ground of variance with the allegation in the petition that Padgett himself paid the warrants.

We were also in error in reciting in the original opinion a finding by the trial judge that, when Padgett issued the 1,647 checks on warrants other than the 143 involved in this suit, he required receipts therefor to be written across the face of the warrants. In the motion for rehearing the following is said:

"This honorable court ·erred in finding that the trial court found as a fact that the appellant Padgett was guilty of negligence in issuing the checks upon which the questioned warrants were taken up, because the record shows that the trial court made no findings of fact whatever concerning the issue of negligence, but concluded as a matter of law that the appellant Padgett was guilty of negligence in certain particulars. * * *"

And in that connection it is further insisted that such ruling by this court is in conflict with the following decisions: Bogart v. Cowboy State Bank & Trust Co., 182 S. W. 682; Farmer v. Hale, 14 Tex. Civ. App. 73, 37 S. W. 164; Edwards v. Chisholm (Sup.) 6 S. W. 558; Midland Ry. v. Johnson, 65 S. W. 388; Zachariae v. Swanson, 34 Tex. Civ. App. 1, 77 S. W. 627; West End Town Co. v. Grigg, 93 Tex. 456, 56 S. W. 49.

But in Wells v. Yarbrough, 84 Tex. 663, 19 S. W. 865, our Supreme Court used this language:

"In this connection the appellants complain of the findings on the ground that the conclusions of law were not separated from the conclusions of fact, contending that the fourth conclusion of fact is in reality a conclusion of law. Such conclusions should be kept distinct, but the failure to do so cannot, as a general thing, be treated as a ground for reversing the judgment. While we think that the fourth finding should have been treated as a conclusion of law and not of fact, there is about it nothing confusing or misleading. It is clearly stated, and its place in the record was no doubt the result of a harmless inadvertence upon the part of the trial judge."

The general rule announced in that decision is followed in the following cases: Lastovica v. Sulik, 33 S. W. 910; Robert McLane Co. v. Swernemann, 189 S. W. 282, and other cases therein cited. And in all those cases it was held that the improper intermingling of findings of fact and conclusions of law by the inclusion of the findings of fact in the list of conclusions of law and vice versa did not amount to reversible error.

We confess that it is difficult to escape the conclusion that there is a conflict between the decisions so cited by appellants and those last cited by us. However, by no assignment of error contained in appellants' brief was the specific contention presented that the judgment could not be sustained by reason of a failure of the trial judge to find, as specific questions of fact separate from the conclusions of law, that Padgett was guilty of negligence in the particulars enumerated under the heading "Conclusions of Law." While in several assignments it was insisted that the trial judge erred in finding as a conclusion of law that Padgett was guilty of negligence in respect to certain particulars, yet in giving reasons for such contentions, both in the assignments of error themselves and propositions and discussions ·thereunder, the specific question now under discussion was not raised, but, on the contrary, such findings of negligence so· challenged were discussed as findings of fact unsupported by evidence or as being contrary to the evidence.

We think it is sufficiently clear from the record that the findings of negligence by the trial judge were really intended as findings of fact, and not as mere conclusions of law, although, in one instance at least, one of such findings appears to have been intended to be a finding of negligence per se, and therefore negligence as a matter of law as well as a question of fact; and under the circumstances noted we do not think that we erred in treating the findings of negligence as findings of fact rather than as conclusions of law.

Appellants insist further that we erred in our original opinion in stating, in substance, that all parties have proceeded upon the theory that the county is now estopped to recover against the bank by reason of failure of its officers to bring to the notice of the bank the forgeries by Padgett until after Fry had disposed .of his property out of which the bank otherwise could have made good some of its losses resulting from the payment of the forged checks. This statement was predicated upon the fact that neither in the trial court nor in this court did the county in any manner contend that the bank was liable, and the further fact that we found no assignment in appellants' brief specifically attacking the conclusion of the trial judge that the county was so estopped. However, for the sake of entire accuracy, such statement in our original opinion is hereby withdrawn, in view of appellants' plea over against the bank, upon the doctrine of subrogation to the county's right to hold it liable, and the further fact that in Padgett's reply brief to the briefs by the bank it was strenuously insisted that the county could not be so estopped by reason of the provisions of section 55 of article 3 of our State Constitution, reading as follows:

"The Legislature shall have no power to release or extinguish, or to authorize the release or extinguishing, in whole or in part, the indebtedness, liability or obligation of any incorporation or individual, to this state, or to any county, or other municipal corporation, therein."

And in connection with the citation of that constitutional provision appellants also have cited upon the same question such decisions as the following: Delta County v. Blackburn, 100 Tex. 51, 93 S. W. 419;

Slaughter v. Hardeman Co., 139 S. W. 662; Tarrant County v. Rogers, 125 S. W. 592; Lindsey v. State of Texas, 96 Tex. 586, 74 S. W. 750.

With the foregoing corrections in our original opinion the motion for rehearing is overruled. Overruled.

CONNER, C. J., not sitting, serving on Writ of Error Committee at Austin. ..